Filed 10/7/20  P. v. Yocom CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL ALAN YOCOM,<br><br>Defendant and Appellant. | F077786<br><br>(Tulare Super. Ct. No. PCF340051)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Michael B. Sheltzer, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna, Julie A. Hokans and Timothy L. O'Hair, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Michael Alan Yocom was convicted of the attempted murder of a peace officer and additional offenses, and sentenced to 30 years to life plus 10 years, after resisting a deputy who tried to arrest him for violating a restraining order, threatening to kill him, beating him with his handcuffs, and partially pulling the deputy's gun out of his holster. On appeal, defendant contends his defense counsel improperly conceded his guilt on four of the six charges in closing argument, in violation of his constitutional rights. Defendant also argues the matter must be remanded for the court to consider whether to dismiss the prior serious felony enhancement, strike the prior prison term enhancements, and recalculate his credits.

We remand the matter on the sentencing issues and otherwise affirm.

## FACTS

### The restraining orders

Charles and Tina Yocom, defendant's father and stepmother, lived in a house on a rural property in Strathmore. On October 19, 2015, the Tulare County Superior Court granted Ms. Yocom's motion and issued a domestic violence restraining order for defendant to stay at least 100 yards away from Ms. Yocom, her house, property, and/or driveway; prohibiting defendant from harassing, stalking, attacking, assaulting, or molesting her; and contacting her, either directly or indirectly. The order was valid until October 19, 2018. On February 5, 2016, the restraining order was served on defendant.

On April 8, 2016, the court granted Mr. Yocom's motion and issued a similar restraining order against defendant with the same prohibitions, with the additional provisions to stay 100 yards away from Mr. Yocom's vehicle and workplace. Defendant was also ordered to immediately move out of his father's Strathmore residence. The order was valid until April 8, 2018. On or about April 11, 2016, the restraining order was served on defendant.

2.

**Defendant arrives at the residence**

On August 28, 2016, defendant arrived at the Yocums' residence in Strathmore and knocked on the front door. Ms. Yocum opened the door and told defendant to leave. She called the sheriff's department and watched him walk away.

Mr. Yocum was outside and saw defendant walking through his property. He told defendant to leave or he would call the police. Defendant raised his hands as if to say, " 'What's up' " or " 'I don't care,' " and kept walking.

Shortly after 5:00 p.m., Tulare County Sheriff's Deputy Douglas Reuter responded to the Yocums' residence. Reuter spoke to them and determined defendant had violated the domestic violence court orders. Defendant was not on the property. Based on their information, Reuter drove his patrol vehicle on a nearby road to look for defendant.

**Deputy Reuter's initial contact with defendant**

Deputy Reuter found defendant sitting against a tree in an orchard that was about a mile and a half from the Yocums' property. Reuter parked his marked patrol vehicle and got out to talk to defendant.

Deputy Reuter had been a deputy for approximately nine months. He was wearing his sheriff's department uniform. He carried his service firearm on his left side because he was left-handed. He also had pepper spray and a baton on his belt. He did not have a Taser because he had not yet completed the required training course.

Deputy Reuter walked up to defendant and identified himself as a deputy. He asked defendant to stand up and defendant did so. Reuter said he needed to talk to defendant and conduct a pat down search for weapons for officer safety. Defendant turned around and placed his hands on top of his head.

Deputy Reuter testified defendant was not aggressive, but he seemed upset. Reuter conducted the pat down search without incident. He found a metal object, a length of rope, and some cash in defendant's pockets, and tossed them away. It was later determined the metal object was a small flashlight.

3.

Deputy Reuter testified that as he conducted the pat down search, defendant kept asking if he was going to jail. Defendant started to tense up and "became agitated and his muscles were locking up as if he were going to do something."

After completing the pat down search, Deputy Reuter moved defendant's hands from above his head to behind his back, because he was going to put him in handcuffs and arrest him for violating the restraining order. While Reuter was not normally permitted to arrest a person who committed a misdemeanor outside his presence, there was an exception to that policy for a person who violated a domestic violence restraining order.

Defendant kept saying he was not going to jail. Deputy Reuter told defendant to relax and they would work it out. As Reuter reached for his handcuffs, defendant pulled his hands away from Reuter. Defendant punched Reuter in the head with his right fist. Reuter immediately sent out a radio broadcast that he was in a fight with a suspect.

Defendant walked away from Deputy Reuter and picked up the metal object, the rope, and the other items that Reuter had tossed from his pockets. Defendant backed away and faced Reuter. Reuter pulled out his baton and walked toward defendant. Defendant continued to step back and kept saying, " 'I am not going to jail.' " Reuter told defendant to relax and get on the ground.

Defendant started to walk toward Deputy Reuter. When defendant was within a few feet, Reuter pulled out his firearm with his left hand. Defendant said, " 'Don't shoot me' " and backed away. Reuter returned his firearm to his holster and secured it.

**Defendant threatens Reuter**

Deputy Reuter testified defendant continued to ignore his orders to get down on the ground. Reuter pulled out his baton and hit defendant on the left arm, and again ordered him to get down. Defendant refused to comply and said, " 'I'm going to f[**]king tie you up, f[**]king kill you.' " Defendant was within two feet of Reuter.

4.

Reuter continued to strike defendant with the baton.  The baton strikes did not seem to have any effect on defendant.

Deputy Reuter testified defendant initially backed away, and then started to move toward him again.  Reuter backed up and tripped on a small tree or drip line.   Reuter fell on his back, dropped his baton, and rolled on his left side to protect his firearm.  Defendant fell on top of Reuter's right side.

**Reuter's body camera**

Deputy Reuter's body camera was activated for part of the encounter and the video lasted one minute 31 seconds.  The audio began 30 seconds into the video.  The prosecution introduced the video and an audio transcript into evidence.

The silent part of the videotape began with Deputy Reuter and defendant in the orchard.  Reuter had apparently concluded the pat down search.  Defendant's hands were on top of his head, and Reuter guided defendant's hands behind his back and appeared about to place him in handcuffs.  Defendant swung his hand down, pushed away from Reuter, walked forward, leaned down to the dirt, and apparently retrieved the items that Reuter found in his pockets and tossed away.

Defendant turned around and faced Deputy Reuter.  Reuter walked toward defendant, and defendant walked away from him.  When the audio begins, Reuter is heard repeatedly ordering defendant to get on the ground.  Defendant backed away and yelled, "You better get the f[**]k away from me," and "I'm telling you mother-f[**]ker get the f[**]k away."

Deputy Reuter told defendant to relax and get on the ground.  Defendant kept backing up and again told Reuter to stay away from him.  Reuter pulled out his baton, kept walking toward defendant, and again told him to get on the ground.

Deputy Reuter got closer to defendant and briefly pulled out his gun with his left hand.  Defendant yelled, "Don't shoot me, mother f[**]ker."  Reuter returned the gun to his holster.  Reuter still had the baton in his right hand, walked toward defendant, and

5.

continued to tell him to get on the ground. Defendant walked away from him and yelled, "Get the f[**]k away from me I'm gonna tie your ass up mother-f[**]ker!"

Deputy Reuter was close to defendant and swung the baton at him several times. Reuter fell, and defendant got on top of him, and they struggled with each other. According to the transcript, defendant told Reuter: "Bitch, you mother …. Bitch, I'm gonna kill you motha--." Reuter again told him to relax as they struggled, and the video ended.

Deputy Reuter testified the video ended because his body camera became disconnected during the struggle. However, the struggle continued after the body camera video ended.

**Defendant chokes Reuter**

Deputy Reuter testified after he fell, defendant fell on top of him and wrapped his arm around his neck. Defendant choked him and made it harder for Reuter to breath. Defendant hit Reuter's chest with the metal object that Reuter had earlier found in his pocket, later determined to be the small flashlight. Reuter kept telling defendant to relax, and defendant repeatedly said, " 'I am going to f[**]king kill you, I am not going to jail.' "

Deputy Reuter testified he was scared and knew the closest backup deputy was "a long way away so it was just me and him." Reuter did not try to use his pepper spray.[1]

Defendant continued to choke Deputy Reuter with one arm, dropped whatever he was holding in his other hand, and reached for Reuter's handcuffs on his belt. Reuter tried to pull defendant's arm from around his neck. Defendant grabbed the handcuffs and used them "kind of as knuckles" and hit Reuter in the chest five to 10 times.

---

[1] Deputy Reuter testified that he knew defendant had been involved in an incident with another deputy the prior week where he had taken pepper spray away from the deputy, and Reuter believed defendant was already "more dangerous" than he had been during the prior incident.

**Defendant reaches for Deputy Reuter's firearm**

Deputy Reuter obtained control of the handcuffs and tossed them away. Defendant continued to choke Reuter with his left arm. Reuter was on his back, and defendant used his left arm to reach for his service weapon. Defendant unlocked the holster and started to pull out the firearm.

Deputy Reuter testified he reached for his gun. He realized defendant's hand was on the grip and he had pulled it out of the holster. Defendant was still on top of Reuter, and they struggled over the firearm. Reuter feared that if defendant obtained control of his firearm, defendant could shoot and kill him and any backup officers who arrived at the scene.

**Deputy Reuter fires his weapon at defendant**

Deputy Reuter gained control of his firearm and pushed defendant away from him. Reuter remained on his back on the ground. Reuter ordered defendant to stop resisting and defendant came at him again.

Deputy Reuter testified he used his firearm and discharged his entire clip of 11 shots at defendant. Reuter believed he was sitting on the ground and facing defendant when he fired.

Deputy Reuter fired his gun at defendant because believed he was going to be killed. "… I had tunnel vision. I knew he was a threat, I knew he was – he was trying to kill me. I did what I knew at that time, what I should do, and there's a million of other things that were playing in my head. [¶] When you are in fear for your life, there's things that happen to your body and to your mind, to your senses that focus – makes all of your focus to the one thing, the threat, and things are not exactly a distance."

Deputy Reuter testified some, but not all, of his gun shots hit defendant. Defendant was wounded but walked away from Reuter and went into the orchard. Reuter repeatedly told defendant to stop and he would get him help, but defendant kept walking.

7.

Deputy Reuter contacted dispatch, reported shorts were fired, and requested medical assistance for defendant. After defendant walked for about 50 yards, he fell to the ground. Reuter placed him in handcuffs and waited for backup and medical assistance to arrive.

Deputy Reuter testified that after the incident was over, he had cuts and bruises on his forehead, arms, and around an eye. He was also covered with defendant's blood from the gunshot wounds.[2]

**Brandon Woods describes the shooting**

Brandon Woods was driving by the orchard when he noticed a marked patrol vehicle parked in an odd position on the side of the road. Woods slowed down to see what was going on. He saw two men, later identified Deputy Reuter and defendant. They were on the ground and fighting.

Woods got out of his car to see if the officer needed help. Woods testified defendant and Deputy Reuter split apart, and both of them stood up. Reuter and defendant stood face-to-face, about seven to 10 feet apart. Woods testified defendant stood in a "threatening position" with his fists clenched at his sides, and it "sounded like he was saying something," but Woods could not hear what he said. Defendant leaned forward like he was going to run toward Reuter. Woods testified defendant acted like "he wasn't all there" and had no expression on his face.

Woods testified Deputy Reuter drew his gun and repeatedly yelled at defendant to stop and get on the ground. Defendant did not comply and walked toward Reuter. Reuter fired his gun at defendant multiple times. Woods was positive he emptied his entire clip. Defendant turned around and walked into the orchard. Reuter ordered defendant to stop and get down, but defendant kept walking. Reuter reloaded his weapon

---

[2] The Porterville Police Department subsequently investigated the shooting.

and followed defendant into the orchard. Woods backed away because he was frightened and did not hear any more gunshots.

**Prior incident**

On August 8, 2016, Tulare County Sheriff's Sergeant Victor Bonilla was the shift supervisor at the Porterville substation. Defendant was being transferred from the holding cell into a van for transportation to the county jail. He jumped out of the van and managed to get out of the leg shackles. Several deputies tried to restrain him, and a struggle ensued on the ground; defendant took a can of pepper spray away from Deputy Pinheiro's belt. As Sergeant Bonilla and the other deputies got defendant into the van, defendant tried to kick Bonilla.[3]

## DEFENDANT'S TESTIMONY

Defendant testified he was sitting under a tree on the property of Gary Fox, someone he knew well, and had the right to be on private property. On cross-examination, defendant admitted he went to his parents' house but insisted he had an ownership interest in the property. While the prosecution had introduced the restraining orders into evidence that showed he had been served with them, defendant testified he did not know about the orders and had never been served with them.

Defendant testified Deputy Reuter "appear[ed] out of nowhere" and surprised him. Reuter was in uniform and seemed to be a deputy, but he never identified himself and defendant had never seen him before.

Deputy Reuter told defendant to "turn around." Defendant obeyed and complied with the pat down search. Reuter took a "substantial amount of money" and other "personal, sentimental" items out of his pockets, including "gold rings," part of an old microscope, and a length of rope he had just bought. Defendant claimed he had $800 in

---

[3] The court granted the prosecution's motion to introduce this evidence as relevant to motive and intent pursuant to Evidence Code section 1101, subdivision (b).

his pockets even though the police report said the total cash was $102. Reuter threw everything to the side.

Defendant testified that based on Deputy Reuter's conduct, he believed Reuter was posing as an officer to rob him. Defendant tried to pick up his property and told Reuter to stay away from him. Reuter used the baton against him, and defendant feared for his life and thought it " 'was all over with.' "

Defendant felt it was necessary to defend himself because he was on private property and suspicious of Deputy Reuter.

Defendant raised his arms to block Deputy Reuter's baton, pushed him away, and did not throw any swings at him. Reuter hit him with the baton. Defendant again tried to pick up his belongings and Reuter pulled his gun.

Defendant testified Deputy Reuter returned the gun to his holster and initially said he did not fire any shots. However, defendant also claimed Reuter fired one shot and hit him in the head, even though it could not be heard on the body camera footage.

Defendant testified he did not recall making any statements or threats to Deputy Reuter. Defendant conceded he might have made some "confrontational" statements. He testified that if he did make any statements like that, it would have been "in the excitement" and "because [of] the anxiety and the emotion of it all, it was in a self-defense type thing."

Defendant testified they got into a "wrestling fight." He said he might have used his fists, but it was all self-defense, and he never intended to take Deputy Reuter's firearm or kill him. Defendant conceded that Reuter's body camera showed that he fell on top of Reuter.

Defendant testified Deputy Reuter lied in court about everything and disagreed about what Reuter's body camera video showed. Defendant said he never put his arm around Reuter's neck; he never tried to choke Reuter; and he did not remove Reuter's handcuffs and hit Reuter with them. Defendant also disputed the accuracy of the body

10.

camera audio and that he said he was going to tie up and kill Reuter. After the body camera video was played again, defendant said, "If I said it, I said it. I am already in a confrontational situation with him because he is charging me, hitting me with a baton, and then he shoots me in the head."

Defendant testified he was walking away from Reuter when he was shot 11 times in the back, and he was also hit in the arms, torso, chest, and head. On cross-examination, the prosecutor asked defendant to review his medical records and photographic exhibits. At one point, defendant conceded they showed he was not shot in the back.[4] The prosecutor also pointed out that his medical records showed the head injury was from a baton blow, but defendant insisted that was a gunshot wound.

Defendant also testified that Deputy Pinheiro's account of the prior incident was not accurate. He testified that he never kicked or resisted any officers, and he never took a deputy's pepper spray. Instead, defendant said he was "brutally assaulted" by the deputies that day because they "slammed" him down in the transportation van while he was shackled.

Defendant admitted that in November 2008, he was convicted of felony grand theft, receiving stolen property, and evading, but claimed the convictions had been reversed. He was convicted of resisting a peace officer in December 2003 and November 2008.

### REBUTTAL

As rebuttal evidence, the court granted the People's motion to introduce additional evidence about defendant's prior encounters with law enforcement officers.

---

[4] Neither party called a physician or other medical expert to testify about the nature and extent of defendant's gunshot wounds. According to the probation report, defendant was shot in his right inner shoulder, left inner forearm, left elbow, left upper thigh, left outer forearm, and a grazing gunshot wound to his forehead.

Deputy Jason Baillie testified he was involved in the altercation between defendant and several other deputies on August 8, 2016.  Defendant was in leg shackles and loaded into the transportation van for the drive from the substation to the jail.  Defendant kicked the closed doors and demanded to be escorted out so he could smoke a cigarette.  Baille said no and started to drive out of the substation.  Defendant kept violently kicking the doors, and Baille decided to remain in the substation to deal with the situation in a secure area.

After he parked at the substation, Deputy Baille opened the van's doors and ordered defendant out.  Defendant refused and cursed him.  Baille tried to pull defendant out and defendant kicked him.  Deputy Pinheiro and other deputies tried to restrain defendant.  Sergeant Bonilla ordered defendant to calm down.  Defendant continued to kick and struggle, and he managed to swing off his leg shackles.  Defendant grabbed pepper spray from Pinheiro's belt.  Defendant was ultimately restrained, and the deputies regained control of the pepper spray before defendant used it.

On May 18, 2016, defendant was involved in another incident when he was contacted by Deputy Pinheiro.  Defendant ran to a bicycle and rode away.  He was subsequently apprehended and resisted the deputies who were arresting him.  When Pinheiro contacted defendant that day, defendant ran to a nearby bicycle and fled.  Defendant was ultimately apprehended, and he resisted the arresting deputies.

The court advised the jury that in April 2016, defendant was placed on summary probation for a misdemeanor violation of the restraining order.

## PROCEDURAL HISTORY

**The charges**

Defendant was charged with the following offenses:  count 1, attempted murder of a peace officer (Pen. Code, §§ 664/187, subd. (a));[5] count 2, assault with a deadly

---

[5] All further statutory citations are to the Penal Code unless otherwise indicated.

weapon on a peace officer (§ 245, subd. (c)); count 3, criminal threats (§ 422); count 4, resisting an executive officer by threats or violence (§ 69), with the personal use of a dangerous weapon, a metal instrument (§ 12022, subd. (b)(1)); count 5, resisting arrest and removing and taking an officer's firearm (§ 148, subd. (c)); and count 6, misdemeanor violation of a domestic relations court order (§ 273.6, subd. (a)). It was further alleged that defendant had one prior serious felony conviction (§ 667, subd. (a)), one prior strike conviction, and six prior prison term enhancements (§ 667.5, subd. (b)).

The court appointed the public defender to represent defendant.

## Pretrial *Marsden* hearings

On September 9, 2016, shortly after the arraignment, the court heard and denied defendant's *Marsden* motion.

On December 9, 2016, defendant said he wanted to bring "criminal charges" against the district attorney and arresting officer for perjury and requested a *Marsden* hearing. The court conducted another in camera hearing and denied the *Marsden* motion.

On January 13, 2017, defendant requested to represent himself, and said he wanted to "resolve" the case with the district attorney. As the court advised defendant about his right to counsel, defendant clarified he wanted to have an attorney, but he did not want the public defender, and instead requested a *Marsden* hearing. The court conducted another in camera hearing and denied the *Marsden* motion.

At a hearing on February 24, 2017, defendant addressed the court and demanded a "resolution" of the charges from the district attorney. The deputy district attorney said defense counsel had inquired about a plea offer and there was nothing on the table.

On March 24, 2017, the court heard and denied another *Marsden* motion. The court also denied defendant's section 995 motion to dismiss.

## Pretrial competency proceedings

On May 4, 2017, defendant told the court that the district attorney had agreed to dismiss all charges and release him. Defense counsel declared a doubt as to defendant's

competence. The court suspended criminal proceedings and appointed Dr. Middleton to examine him pursuant to section 1368.

On June 5, 2017, Dr. Middleton filed a report that stated defendant refused to cooperate with his evaluation, and he was malingering and competent to stand trial.

On July 6, 2017, the court reviewed Dr. Middleton's report and defense counsel asked for another evaluation. Defendant objected and made another *Marsden* motion. The court heard and denied the *Marsden* motion.

The court directed Dr. Middleton to examine defendant again, and appointed Dr. Hughes to examine defendant pursuant to section 1368. Defendant demanded a plea offer for time served. Defense counsel said the district attorney had already refused to reduce the charges.

On July 13, 2017, Dr. Hughes filed a report that found defendant was competent to stand trial.

On August 8, 2017, Dr. Middleton filed another report, stated he was able to conduct an evaluation, and found defendant was not competent to stand trial and needed psychiatric care.

On September 22, 2017, the court heard and denied another *Marsden* motion.

On October 31, 2017, the court held a contested hearing on defendant's competency; defendant waived his right to a jury. Dr. Middleton's second report found he was not competent. The prosecutor submitted on Dr. Hughes's report that defendant was competent and argued defendant's prior statements to the court also showed his competency. Defendant testified at the hearing that he was competent, he wanted to file charges against his attorney for doubting his competency, and the court should have already dismissed the charges.

The court found defendant was competent and reinstated criminal proceedings.

**The court grants defendant's *Marsden* motion**

At the October 13, 2017, hearing, shortly after the court found he was competent and reinstated criminal proceedings, defendant made another *Marsden* motion and the court conducted an in camera hearing.

After conducting the in camera hearing, the court reconvened and advised the prosecutor that it had not found the public defender had been ineffective, but it had "reluctantly" granted defendant's *Marsden* motion, discharged the public defender, and appointed conflict counsel to represent defendant.

**Jury trial**

On January 9, 2018, defendant's jury trial began with motions. Defendant was represented by Mr. Ramirez, who had been appointed from the conflict counsel list. Defense counsel said he needed to review the prior conviction allegations to determine if any were subject to reduction under Proposition 47.[6]

On January 11, 2018, defense counsel declared a doubt about defendant's competency. The court stated defendant acted both rationally and irrationally during trial, and it was not sure if he was incompetent or malingering. Defendant objected and said he was competent and ready for trial. The court conducted an in camera hearing with defendant and his attorney. After the hearing, the court reconvened and said there was no substantial evidence defendant was incompetent, and his jury trial continued.

On January 12, 2018, immediately after Deputy Reuter completed his trial testimony, defendant addressed the court and declared there should be a mistrial because he disagreed with his attorney for failing to lay a foundation aid a foundation for Reuter's testimony. The court denied the motion and the trial continued.

---

[6] Defense counsel never made a motion to reduce defendant's prior convictions to misdemeanors pursuant to Proposition 47.

15.

On the same day, after Deputy Pinheiro's testimony, defense counsel asked the court to conduct another section 1368 inquiry because defendant made statements that indicated he did not understand what was going on. Defendant addressed the court, said he understood what was going on and they were there for a jury trial, and he was competent. Defendant also said he wanted a mistrial. The court asked defendant if he knew the trial was going on. Defendant said he knew that. The court declined to make any additional findings and the trial continued.

## INSTRUCTIONS AND ARGUMENT

The court instructed the jury with CALCRIM No. 220 about the People's burden of proof beyond a reasonable doubt. The jury also received CALCRIM No. 222, that "[n]othing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence. The attorneys' questions are significant only if they helped you to understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asked a question that suggested it was true."

The court instructed the jury on several lesser included offenses. As to count 1, attempted murder of a peace officer, the jury was instructed on attempted voluntary manslaughter based on imperfect self-defense. As to count 2, assault on a peace officer, the jury was instructed on assault with a deadly weapon and simple assault. As to count 4, resisting an executive officer by threats or violence, the jury was instructed on resisting without force or violence. In count 5, removing and taking an officer's firearm while resisting arrest, the jury received instructions on taking or attempting to take an officer's firearm.

**The prosecutor's closing argument**

The prosecutor reviewed the elements of the charged offenses and began with count 6, violation of the restraining order.

16.

As to count 5, removing and taking an officer's firearm while resisting arrest, the prosecutor urged the jury to review the body-cam videotape that showed defendant willfully resisted Deputy Reuter, and cited Reuter's testimony that after the body camera video ended, defendant unlatched the lock and started to remove the gun from the holster, and Reuter struggled to regain control of his weapon from defendant.

As to count 4, resisting an executive officer by threats or violence, the prosecutor argued the elements were similar to what she had just reviewed for count 5, and again cited the body camera videotape as evidence that defendant violently resisted and fought with Deputy Reuter. The prosecutor also cited the transcript from the body camera video, where defendant threatened to tie up Reuter with a rope, particularly since Reuter had found a rope in defendant's pocket and defendant had retrieved it from the ground; and defendant's threat to kill Reuter. "That entire course of conduct is resisting an executive officer."

As to count 3, criminal threats, the prosecutor clarified the charge was based on defendant's "very clear threat" to kill Deputy Reuter, as heard on the body camera video and shown in the transcript. The prosecutor argued defendant's statement that he was going to tie him up with the rope "help[ed] effectuate the threat and also ma[de] is believable for Deputy Reuter" The prosecutor again played the body camera video and cited the jury to review the transcript in support of her argument on these charges, particularly where defendant resisted and struggled with Reuter and made the threats.

Turning to count 2, assault with a deadly weapon on a peace officer, the prosecutor cited defendant's attack on Deputy Reuter when they were on the ground, defendant placed his arm around Reuter's neck and choked him, and he obtained control of the handcuffs and repeatedly hit him.

Finally, the prosecutor addressed count 1, attempted murder on a peace officer, and explained, "this is really what this case boils down to." The prosecutor argued there was evidence of premeditation because defendant initially did not resist Deputy Reuter,

17.

but then decided to assault him when he realized he was going to jail. The prosecutor also argued defendant had the intent to kill based on his threats to kill Reuter that could be heard on the body camera video. Defendant repeatedly escalated the situation when he jumped on top of him, put his arm around his neck to choke him, took away his handcuffs and repeatedly hit him in the chest, and tried to take Reuter's service weapon away from him. "Why go for somebody's firearm if you don't plan on using it?"

**Defense counsel's closing argument**

Defense counsel began by asking the jury to be aware of "three things on this case, and I need to ask you three questions when you go back there."[7] Counsel then stated:

> "I am going only to address Count[s] 5 and 1. I was here present with all of you and heard all the testimony, and I believe there is sufficient evidence for you to make determinations … as to all counts except 1 and 5. I need you to ask three questions when evaluating the evidence on Count[s] 5 and 1."[8]

Defense counsel started with count 5, removing and taking an officer's firearm while resisting arrest "because it ties directly into Count 1," attempted murder of a peace officer. "The question you have to ask yourself as to Count 5, is whether or not [defendant] actually took Deputy Reuter's firearm. There's conflicting testimony." Counsel cited defendant's testimony that he never took the weapon, and Brandon Woods's testimony that he never saw defendant trying to take the weapon. Counsel argued that even if the jury believed Reuter's account, there was still insufficient evidence to convict on count 5 because defendant "never physically removed [the gun] from the holster. It came out of the holster about halfway … but Deputy Reuter had possession of that firearm throughout the physical altercation."

---

[7] Defense counsel waived making an opening statement.

[8] In issue I, *post*, we will address defendant's argument that defense counsel improperly conceded defendant's guilty on counts 2, 3, 4, and 6 without consulting defendant or defendant being advised of his constitutional rights.

Defense counsel said he also wanted the jury to consider "what was [defendant's] mindset that day, you gotta [*sic*] ask yourself whether or not he truly believed he was acting in self-defense." Counsel conceded defendant threatened Deputy Reuter, based on the statements that could be heard on the body camera videotape. Counsel also conceded defendant's belief that Reuter was impersonating an officer to rob him may have been irrational and unreasonable, but that would not support the charged offense of attempted murder. Instead, counsel urged the jury to consider the lesser offense of attempted voluntary manslaughter based on imperfect self-defense.

**Rebuttal**

In rebuttal, the prosecutor argued defendant's trial testimony was not credible and inconsistent with the body camera footage and the testimony from other deputies about his prior violent acts against them. The prosecutor argued there was no evidence defendant believed Reuter was impersonating an officer because defendant consented to the pat down search, he became violent when he realized he was going to be arrested, and repeatedly said he was not going back to jail.

## CONVICTIONS AND SENTENCE

On January 16, 2018, the jury found defendant guilty of the charged offenses and found the personal use enhancement true. The court found the prior conviction allegations true.

After the jury returned the verdicts, defendant addressed the court and said he wanted to make a motion for a mistrial but did not state his reasons. The court advised defendant to speak with his attorney.

On March 14, 2018, the court continued the sentencing hearing and appointed another attorney to investigate whether there were grounds for a new trial motion.

19.

**Defendant's postverdict letters**

On or about March 27, 2018, defendant sent a letter to the court and claimed he was being "tortured" by the sheriff's department and demanded dismissal of his case and immediate release.

On May 13, 2018, defendant sent another letter to the court and again demanded his immediate release and for the court clerk to "erase" all his outstanding cases from "the computer system."

**The sentencing hearing**

On May 18, 2018, the court convened the sentencing hearing. The attorney appointed to review the trial advised the court that he had reviewed the entirety of the record and concluded there were no grounds for a new trial motion based on ineffective assistance, and he had advised defendant of his conclusions.[9]

The court sentenced defendant to 15 years to life for count 1, attempted murder of a peace officer, doubled to 30 years to life as the second strike term; plus five years for the prior serious felony enhancement, and five consecutive one-year terms for five prior prison term enhancements. The court ordered one prior prison term enhancement stricken since it was based on the same prior conviction as the strike offense and the prior serious felony enhancement. The court stayed the terms imposed for counts 2 through 5 and imposed no additional time for misdemeanor count 6. The court awarded a total of 719 credits and dismissed several unrelated pending cases.[10]

---

[9] In contrast to prior hearings, defendant did not make any statements to disagree with conflict counsel's conclusions about a new trial motion, and he did not personally address the court during the sentencing hearing.

[10] On July 25, 2018, the court issued a corrected minute order and abstract to address clerical errors.

20.

**Defendant's postsentencing letters**

On or about June 18, 2018, defendant sent a letter to the court, claimed his case had been dismissed, and demanded his immediate release because he had a "terminal illness."

On or about June 21, 2018, defendant filed a motion for the trial court to recall and dismiss his case, immediately release him, and claimed the court had dismissed his case and he was erroneously transferred to state prison.

On June 25, 2018, the court denied defendant's requests for his immediate release.

On July 6, 2018, defendant sent a letter to the court, again claimed his case had been dismissed, and demanded his immediate release. Defendant further stated his due process rights were violated because the People never produced a police report. Defendant also sent a letter to the Governor of California to demand his immediate release.

On July 12, 2018, defendant sent a letter to the court and asked for the trial transcripts.

On July 13, 2018, defendant's trial attorney filed a timely notice of appeal.

## DISCUSSION

### I.      Defense Counsel's Closing Argument

Defendant contends that defense counsel improperly conceded his guilt on counts 2, 3, 4, and 6 in closing argument when counsel said: "I am going only to address Count[s] 5 and 1. I was here present with all of you and heard all the testimony, and I believe there is sufficient evidence for you to make determinations … as to all counts except 1 and 5."

As set forth above, counsel used closing argument to address count 1, attempted murder of a peace officer, and count 5, resisting arrest and removing and taking an officer's firearm. Counsel did not address the elements of count 2, assault with a deadly weapon on a peace officer; count 3, criminal threats; count 4, resisting an executive

21.

officer by threats or violence; and count 6, misdemeanor violation of a domestic relations court order.

Defendant argues defense counsel's closing argument amounted to "tacit concessions of guilt" on the four counts he did not address, these "concessions" were "tantamount to guilty pleas, and there was no evidence [he] voluntarily and intelligently waived his constitutional trial rights," in violation of his Sixth Amendment rights as explained in *McCoy v. Louisiana* (2018) ___ U.S. ___ [138 S.Ct. 1500] (*McCoy*) and *People v. Farwell* (2018) 5 Cal.5th 295 (*Farwell*).

Defendant argues defense counsel's "complete concession of guilt" on the four counts was permissible only if defendant was advised of and gave knowing and voluntary waivers of his constitutional rights on those charges. Defendant asserts that since such advisements and waivers were not given, defense counsel's concessions of guilt constituted structural error and the mandates reversal of his convictions.

### A.    *Plea Advisements*

"When a criminal defendant enters a guilty plea, the trial court is required to ensure that the plea is knowing and voluntary. [Citation.] As a prophylactic measure, the court must inform the defendant of three constitutional rights – the privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront one's accusers – and solicit a personal waiver of each," as required by *Boykin v. Alabama* (1969) 395 U.S. 238 and *In re Tahl* (1969) 1 Cal.3d 122. (*People v. Cross* (2015) 61 Cal.4th 164, 170.)

" 'Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel.' [Citations.] Generally, '[t]rial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." [Citation.] Some decisions, however,

are reserved for the client – notably, whether to plead guilty, waive the right to jury trial, testify in one's own behalf, and forgo an appeal.' [Citations.] When counsel overrides a defendant's autonomy on a fundamental decision that is reserved for the client, the defendant's Sixth Amendment rights are violated. [Citation.] 'A violation of the client's right to maintain his or her defense of innocence implicates the client's autonomy (not counsel's effectiveness) ....' [Citation.] Accordingly, such an error is structural and not subject to harmless error review. [Citation.] [¶] We review the legal question of whether defendant's constitutional rights were violated de novo. [Citation.]" (*People v. Palmer* (2020) 49 Cal.App.5th 268, 279–280.)

In the event of a guilty plea or other conduct "tantamount" to a plea, "the record must demonstrate that the defendant voluntarily and intelligently waived his constitutional trial rights. [Citations.]" (*Farwell, supra,* 5 Cal.5th at p. 300.)

"The starting point for our analysis, therefore, is whether defense counsel's concession of guilt during argument … was tantamount to a guilty plea. If not, there was no error. If so, the concession was permissible only if based on a knowing and informed waiver by appellant of his right to trial on that count. [Citation.]" (*People v. Lopez* (2019) 31 Cal.App.5th 55, 63, fn. omitted (*Lopez*).)

### B.    Lucas and Cain

"Defense counsel must not argue against his or her client [citation], but it is settled that it is not necessarily incompetent for an attorney to concede his or her client's guilt of a particular offense. [Citations.] It is also settled that counsel's concession of guilt on one or more charges at the guilt phase of a capital trial is not the equivalent of a guilty plea, requiring defendant's express waiver. [Citations.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 446–447 (*Lucas*).)

In *Lucas*, the defendant argued defense counsel was prejudicially ineffective during closing argument when he admitted the defendant was at the crime scene and "probably committed the murders." The defendant asserted his attorney could not

concede his guilt unless he expressly waived his constitutional rights. (*Lucas, supra*, 12 Cal.4th at p. 446.) *Lucas* declined to find counsel made "an incompetent tactical choice to admit that [the] defendant was at the scene and probably committed the homicides, but to argue his intoxication negated the mental elements necessary for felony murder or premeditated murder. After all, [the] defendant's bloody fingerprint was found at the scene, [the] defendant's hand was cut, blood consistent with his blood, but not with the victims', was found in their home, and a trail of blood led from the scene of the crime to [the] defendant's home. In addition, the bloody knife found at the scene was a knife like one [the] defendant had owned, and blood on [the] defendant's clothing was consistent with the blood of one of the victims. Finally, when he was interrogated by the police, [the] defendant admitted cutting his hand inside the victims' house and identified the murder weapon as his own. [¶] Given this evidence, ' "[i]t is entirely understandable that trial counsel ... made no sweeping declarations of his client's innocence but instead adopted a more realistic approach .... As stated in a recent case, 'good trial tactics demanded complete candor' with the jury. [Citations.] Under the circumstances we cannot equate such candor with incompetence." ' [Citations.]" (*Id*. at p. 447.)

In *People v. Cain* (1995) 10 Cal.4th 1 (*Cain*) (overruled on other grounds in *People v. Moon* (2005) 37 Cal.4th 1, 17), defense counsel told the jury during closing argument that the defendant was guilty of burglary and multiple counts of felony murder. On appeal, the defendant argued these statements were the equivalent of guilty pleas on those charges, and the trial court was required to obtain a plea waiver. (*Cain*, at pp. 29–30.) *Cain* rejected these arguments:

> "We have held trial counsel's decision not to contest, and even expressly to concede, guilt on one or more charges at the guilt phase of a capital trial is not tantamount to a guilty plea requiring a *Boykin-Tahl* waiver. [Citations.] *It is not the trial court's duty to inquire whether the defendant agrees with his counsel's decision to make a concession, at least where, as here, there is no explicit indication the defendant disagrees with his attorney's tactical approach to presenting the defense*. [Citations.]"

24.

(*Id*. at p. 30, italics added; see also *People v. Freeman* (1994) 8 Cal.4th 450, 497; *People v. Hendricks* (1987) 43 Cal.3d 584, 592–594.)

Based on *Lucas* and *Cain*, defense counsel's statements in closing argument were not tantamount to a guilty plea and the court was not required to advise defendant and obtain a waiver of his constitutional rights pursuant to *Boykin-Tahl*. Defense counsel did not concede or stipulate to defendant's guilt in closing argument. Instead, he said that he believed there was "sufficient evidence for you to make *determinations* … as to all counts except [counts] 1 and 5," which alleged attempted murder, and resisting arrest and removing and taking an officer's firearm. (Italics added.) In making this argument, defense counsel was responding to the prosecutor's argument that there was no dispute defendant violated the restraining order to support that charge in count 6, and the videotape and audio from Deputy Reuter's body camera showed that defendant assaulted, resisted, and threatened Reuter, to support the charges in counts 2, 3, and 4. Counsel never conceded defendant's guilt or said anything to contradict the court's instructions that the People had the burden of proving the element of all the charged offenses beyond a reasonable doubt, but instead focused the jury on the charges that were not based on actions depicted in the body camera videotape. Counsel's statements did not require the court to give the *Boykin-Tahl* advisements.

### C. *Nixon*, *McCoy*, and *Farwell*

Defendant contends that *Lucas* and *Cain* have been effectively overruled, and defense counsel's argument violated his Sixth Amendment rights and constituted structural error under *McCoy* and *Farwell*.

#### 1. Nixon

Before addressing those cases, we first examine *Florida v. Nixon* (2004) 543 U.S. 175 (*Nixon*), where the court addressed whether the Constitution bars defense counsel from conceding a capital defendant's guilt at trial "when [the] defendant, informed by counsel, neither consents nor objects." (*Id*. at p. 178.) In that case, defense counsel

25.

explained several times to the defendant a proposed guilt-phase concession strategy, but the defendant was unresponsive. (*Id*. at p. 186.) *Nixon* held that "[w]hen counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest," and the defendant remains silent, "counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent." (*Id*. at pp. 175, 181, 192.)

### 2. McCoy

Defendant primarily relies on *McCoy, supra*, 138 S.Ct. 1500 to argue his attorney violated his Sixth Amendment rights. In *McCoy*, the court distinguished the case from the situation presented in *Nixon*. The defendant in *McCoy* was charged with murdering three members of his estranged wife's family and faced the death penalty. (*Id*. at pp. 1505–1506.) In contrast to *Nixon*, the defendant in *McCoy* "vociferously" maintained his innocence and claimed an alibi defense. (*McCoy*, at p. 1506.) Based on the overwhelming nature of the evidence, however, defense counsel decided to concede the defendant's guilt for the murders to avoid the death penalty. (*Ibid.*) Prior to trial, the defendant learned of counsel's decision. The defendant was " 'furious,' " expressly told counsel not to make the concession, and to seek acquittal; counsel knew the defendant was completely opposed to conceding guilt. The defendant attempted to have counsel relieved as a result of this conflict between them and the court denied the motion. (*Ibid*.)

Despite the defendant's objections, defense counsel told the jury in his opening statement in the guilt phase that "there was 'no way reasonably possible' that they could hear the prosecution's evidence and reach 'any other conclusion than [the defendant] was the cause of these individuals' death.' [Citation.]" (*McCoy, supra*, 138 S.Ct. at p. 1506.) Out of the jury's "earshot," the defendant objected and told the court that his attorney "was 'selling [him] out' by maintaining that [he] 'murdered [his] family.' [Citation.]" The court overruled the defendant's objections. (*Ibid.*) Defense counsel continued his opening statement and told the jury "the evidence is 'unambiguous,' 'my client committed three murders.' [Citation.]" (*Id.* at pp. 1506–1507.)

During the trial in *McCoy*, the defendant testified that he was innocent and gave an alibi defense. In closing argument, defense counsel "reiterated that [the defendant] was the killer," and told the jury that "he 'took [the] burden off of [the prosecutor].' [Citation.]" (*McCoy*, *supra*, 138 S.Ct. at p. 1507.) The jury convicted him of three counts of first degree murder. At the penalty phase, defense counsel again conceded the defendant committed the murders but urged mercy because of his serious mental and emotional issues. The jury returned three death verdicts. (*Ibid*.)

*McCoy* reversed the defendant's convictions and explained that "[t]rial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' [Citation.] Some decisions, however, are reserved for the client – notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. [Citation.] [¶] Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category." (*McCoy*, *supra*, 138 S.Ct. at p. 1508.)

> "Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a capital trial. These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*. [Citations.]
>
> "Counsel may reasonably assess a concession of guilt as best suited to avoiding the death penalty, as [the defendant's trial attorney] did in this case. But the client may not share that objective. He may wish to avoid, above all else, the opprobrium that comes with admitting he killed family members. Or he may hold life in prison not worth living and prefer to risk death for any hope, however small, of exoneration. [Citations.] When a client <u>expressly asserts</u> that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, <u>his lawyer must abide by that objective and may not override it by conceding guilt</u>. [Citations.]" (*Id*. at pp. 1508–1509, underline added.)

*McCoy* distinguished *Nixon* because the defense attorney in that case did not negate the defendant's autonomy "by overriding [the defendant's] desired defense objective, for [the defendant in *Nixon*] never asserted any such objective" and " 'was generally unresponsive' during discussions of trial strategy, and 'never verbally approved or protested' counsel's proposed approach" and only complained after trial. (*McCoy*, *supra*, 138 S.Ct. at p. 1509, citing *Nixon*, *supra*, 543 U.S. at pp. 181, 185.) In contrast to *Nixon*, the defendant in *McCoy* opposed his attorney's assertion of guilt "at every opportunity, before and during trial, both in conference with his lawyer and in open court. [Citations.]" (*McCoy*, at p. 1509.)

"If a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest. Presented with express statements of the client's will to maintain innocence, however, counsel may not steer the ship the other way. [Citation.]" (*McCoy*, *supra*, 138 S.Ct. at p. 1509.) When the defendant expressly disagreed with his attorney about conceding he committed the murders, "it was not open to [the attorney] to override [the defendant's] objection." (*Ibid.*)

*McCoy* concluded defense counsel's admission of a client's guilt over the client's express objection resulted in structural error and required a new trial because the error blocked "the defendant's right to make the fundamental choices about his own defense. [Citation.]" (*McCoy*, *supra*, 138 S.Ct. at p. 1504.) Once the defendant communicated to the court and counsel that he "strenuously" objected to counsel's proposed strategy of conceding guilt, "a concession of guilt should have been off the table," and the court's allowance of counsel's admission of the defendant's guilt "despite [his] insistent objections was incompatible with the Sixth Amendment." (*Id*. at p. 1512.)

### 3. Farwell

Defendant also claims his case is similar to the situation addressed in *Farwell*, *supra*, 5 Cal.5th 295, where the defendant was charged with gross vehicular

manslaughter and misdemeanor driving with a suspended license. During trial, the parties entered into a factual stipulation admitting all the elements of the misdemeanor charge. The court read the stipulation to the jury and instructed the jury that it must accept the stipulated facts as true. (*Id.* at pp. 298–299.)

*Farwell* reversed the defendant's conviction and held that a "stipulation that admits all of the elements of a charged crime necessary for a conviction is tantamount to a guilty plea. [Citations.]" (*Farwell, supra*, 5 Cal.5th at pp. 299–300.)[11] The trial court failed to advise the defendant "of the constitutional rights implicated by a guilty plea or the stipulation. Nor did it solicit a personal waiver of those rights." (*Id.* at p. 299.) Defense counsel's stipulation "conclusively established the stipulated facts as true and completely relieved the prosecution of its burden of proof" on the misdemeanor count. (*Id.* at p. 300.) "While the jury was still required to return a verdict on that count, its limited function did not amount to a jury trial in the constitutional sense" because the court instructed the jury to find the defendant guilty on that count. (*Ibid.*)

*Farwell* further held that it did not have to decide whether the circumstances "affirmatively demonstrate" that the defendant was aware of his constitutional rights "as a general matter. Instead, we find the record insufficient for another reason: There is no affirmative showing that [the defendant] understood he was waiving his trial rights by virtue of the *stipulation* entered on his behalf." (*Farwell, supra*, 5 Cal.5th at p. 306.)

> "When [the defendant's] counsel entered the stipulation, [the defendant] had rejected the plea offer and was in the midst of a jury trial. The trial court had refused to accept his no contest plea to count 2. [The defendant] would correctly have understood that he was accused of both crimes and that the prosecution bore the burden of proving him guilty. *There is no affirmative evidence that [the defendant] understood his stipulation would conclusively establish all of the elements of the misdemeanor crime and*

---

[11] *McCoy* was decided on May 14, 2018. *Farwell* was filed a few weeks later, on June 21, 2018, but does not cite to *McCoy*.

*make the guilty verdict a foregone conclusion.* [Citation.]" (*Id.* at pp. 307–308, italics added, fn. omitted.)

*Farwell* concluded "[t]he rule requiring a constitutionally valid waiver of trial rights by a criminal defendant applies here because this particular kind of stipulation is tantamount to a guilty plea." (*Farwell, supra*, 5 Cal.5th at p. 308.) The record failed "to *affirmatively* show that [the defendant] understood his counsel's stipulation had the effect of waiving his constitutional trial rights," and reversed the conviction since "[t]he stipulation was the only basis for the jury's misdemeanor verdict." (*Id.* at p. 298, italics added.)

### D. Application of McCoy and Farwell

Several cases have addressed whether *McCoy* and *Farwell* apply when defense attorneys make concessions in closing arguments in the absence of their clients' consent and waiver of constitutional rights.

In *Lopez, supra*, 31 Cal.App.5th 55, the defendant ran over a motorcyclist while intoxicated, and he was charged and convicted of second degree murder and felony hit and run. In both his opening statement and closing argument, defense counsel conceded the defendant's guilt of felony hit and run and instead focused on the murder charge. The defendant argued the concession was "tantamount to a guilty plea" on the hit and run charge and relieved the prosecution of its burden of proof, as prohibited by *McCoy* and *Farwell*. (*Lopez*, at pp. 62, 64.)

*Lopez* distinguished the case from *Farwell* because "there was no stipulation admitting the elements of the hit and run as an evidentiary matter. Instead, the jury was instructed that the prosecution had to prove guilt on all counts beyond a reasonable doubt and that statements by counsel were not evidence. Thus, the prosecution was still required to present 'competent, admissible evidence establishing the essential elements' of each charge. [Citation.]" (*Lopez, supra*, 31 Cal.App.5th at p. 64.) *Lopez* rejected the defendant's attempt to extend *Farwell* to a concession made during closing argument:

"Indeed, courts have repeatedly distinguished between such circumstances and a guilty plea or its equivalent. [Citations.]" (*Lopez*, at p. 65.)

*Lopez* also rejected the defendant's reliance on *McCoy* because there was "no evidence that [the defendant] raised any objection to his counsel's decision to concede guilt on the hit-and-run charge. Nevertheless, [the defendant] urges us to apply *McCoy's* analysis of a defendant's constitutional right to control the objectives of his or her own defense to cases, such as this one, where the defendant has not expressly raised an objection." (*Lopez*, *supra*, 31 Cal.App.5th at p. 66.) "[W]e have found no authority, nor has [the defendant] cited any, allowing extension of *McCoy's* holding to a situation where the defendant does not expressly disagree with a decision relating to his right to control the objective of his defense." (*Ibid*.; see also *People v. Burns* (2019) 38 Cal.App.5th 776, 779, 781–783 [*McCoy* and *Farwell* not violated when defense counsel conceded issues, counsel's argument did not amount to a stipulation, and record was silent as to whether defendant disagreed or objected]; *People v. Franks* (2019) 35 Cal.App.5th 883, 888–891 [*McCoy* not violated when no evidence defendant disagreed with defense counsel's concessions]; *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1166 [*McCoy* and *Farwell* not violated where no evidence that defendant directed his attorney not to concede any issues and counsel's argument was not a stipulation].)

In *People v. Eddy* (2019) 33 Cal.App.5th 472 (*Eddy*), the court found the circumstances of defense counsel's closing argument concession were identical to *McCoy* and reversed the defendant's conviction for first degree murder. In his opening statement, defense counsel outlined the defense theory of factual innocence and that another person committed the murder. In closing argument, however, defense counsel conceded defendant committed voluntary manslaughter, and argued he was not guilty of first or second degree murder. The defendant was convicted of first degree murder. (*Eddy*, at p. 477.) At a postconviction *Marsden* hearing, the defendant told the court that he had disagreed with defense counsel's decision to argue for voluntary manslaughter

31.

prior to closing argument, and that he told his attorney that he wanted to continue with his defense of factual innocence. (*Eddy*, at p. 478.) Defense counsel admitted he discussed his strategy with the defendant and knew about his opposition prior to giving his closing argument but went with what he thought was best for the defendant in his professional opinion. (*Id*. at pp. 477–478.)

*Eddy* held that "on this record," defendant's Sixth Amendment rights were violated and found "no meaningful basis upon which to distinguish this case from *McCoy*'s recognition of a defendant's absolute right to maintain innocence as the objective of his defense." (*Eddy*, *supra*, 33 Cal.App.5th at p. 477.) *Eddy* found it was clear from the *Marsden* hearing that the defendant instructed his attorney prior to closing argument not to concede he was guilty of manslaughter. (*Eddy* at pp. 481482.)

> "[W]hile defendant did not object during closing argument after his counsel conceded his guilt of voluntary manslaughter, we do not think preservation of the Sixth Amendment right recognized in McCoy necessarily turns on whether a defendant objects in court before his or her conviction. Rather, the record must show (1) that defendant's plain objective is to maintain his innocence and pursue an acquittal, and (2) that trial counsel disregards that objective and overrides his client by conceding guilt. [Citation.] Although such evidence may come in the form of a defendant objecting during argument, on this record we conclude McCoy applies here." (*Id*. at pp. 482–483; see also *People v. Flores* (2019) 34 Cal.App.5th 270, 274–275, 280–282 [Defendant's Sixth Amendment rights were violated pursuant to *McCoy* when defendant unambiguously objected at a pretrial *Marsden* hearing that his attorney wanted to concede against his wishes].)

### E.    Analysis

Defendant asserts that as in *McCoy*, his attorney violated his Sixth Amendment rights when he conceded in closing argument that defendant committed four of the six counts, and as in *Farwell*, the concessions were "tantamount to guilty pleas, as counsel agreed there was sufficient evidence for 'all of the elements of a charged crime necessary to a conviction' and 'relieved the prosecution of its burden of proof.' "

We disagree. First, defense counsel did not tell the jury that defendant was guilty of any of the charged offenses.

Second, even if counsel's argument constituted a concession, there is nothing in the record to suggest defendant expressed his "intransigent and unambiguous objection" to defense counsel's closing argument, as required by *McCoy*. (*McCoy*, *supra*, 138 S.Ct. at p. 1507.) As set forth in the procedural history, defendant repeatedly addressed the court throughout these proceedings where he expressed his disapproval of the court's rulings, demanded several *Marsden* hearings, disagreed with his attorney's decision to request a competency hearing, and demanded a plea offer from the prosecutor. In contrast to those instances, defendant did not make any statements to the court or request another *Marsden* hearing before or after closing argument. After his conviction, defendant said he wanted to make a motion for mistrial but did not complain about closing argument. The court appointed another attorney to determine whether a new trial motion should be filed. When the attorney stated that such a motion was not warranted, defendant did not voice his objections.

Defendant argues *Farwell* also controls the outcome of this case because defense counsel's argument was "tantamount to a guilty plea," effectively advised the jury to convict defendant of the four counts and eliminated the People's burden of proof. (*Farwell*, *supra*, 5 Cal.5th at pp. 298, 307.) In contrast to *Farwell*, however, defense counsel's closing argument was not tantamount to a concession of guilt because his statements alone could not have resulted in defendant's conviction. The jury was instructed on the People's burden of proof and that the statements of the attorneys did not constitute evidence, and the court never instructed the jury that counsel's argument negated those instructions. "[T]here was no stipulation admitting the elements of the [the charged offenses] as an evidentiary matter. Instead, the jury was instructed that the prosecution had to prove guilt on all counts beyond a reasonable doubt and that statements by counsel were not evidence. Thus, the prosecution was still required to

33.

present 'competent, admissible evidence establishing the essential elements' of each charge. [Citation.]" (*Lopez, supra*, 31 Cal.App.5th at p. 64.)

While defense counsel said there was "sufficient evidence" for the jury "to make determinations in all but counts 1 and 5," he did not tell the jury to conclude defendant was guilty of all charges. Thus, defense counsel's argument did not alter or limit the jury's role in determining defendant's guilt. (See *Lopez, supra*, 31 Cal.App.5th at p. 64.) Even if counsel's argument amounted to a concession, the reasoning in *Farwell* has not been extended to concessions made by a defense attorney in closing argument. (See, e.g., *Bernal, supra,* 42 Cal.App.5th at pp. 1166–1167; *Burns, supra*, 38 Cal.App.5th at pp. 782–784; *Lopez, supra*, 31 Cal.App.5th at pp. 63–67.)

Defendant concedes that unlike *McCoy*, "there is no evidence in the record [defendant] objected to defense counsel's strategy," but argues that his plea of not guilty, and his trial testimony that he was innocent of all charges, was sufficient to show his disagreement with counsel's decision to concede guilt on four counts. We note that none of the cases have held that defendant's plea of not guilty was sufficient to preserve his objections under *McCoy*. A similar argument was rejected in *In re Smith* (2020) 49 Cal.App.5th 377 (*Smith*), which held *McCoy* did not apply to a situation where the defendant confessed to the police that he killed the victim, then pleaded not guilty, and testified at trial that he was innocent and lied in his confession. The prosecutor asserted in closing argument that the defendant was guilty of first degree murder. In response, defense counsel argued the offense was second degree murder. The defendant again interrupted and said he did not do it. The court held an immediate hearing, and defense counsel said he advised the defendant that the jury would not believe his trial testimony, and the best strategy was to argue he was only guilty of the lesser offenses. (*Smith*, at pp. 389–390.)

*Smith* held that while the defendant pleaded not guilty and testified that he was innocent, *McCoy* did not apply to counsel's concession because the defendant "did not

object or seek to substitute counsel *prior* to the defense counsel's closing argument. He did not 'vociferously insist' that he did not engage in the charged acts *prior* to counsel's argument, although he had been made aware of the change of strategy, and he did not 'adamantly object[] to any admission of guilt' when informed, before the defense closing argument, that the jury would not buy it." (*Smith*, *supra*, 49 Cal.App.5th at p. 390.) *Smith* further held that while the defendant objected during closing argument, "it was after the concession had been made, so it cannot be said that at the time counsel made the concession, it was over [the defendant's] intransigent and unambiguous objection." (*Ibid.*)

In this case, defendant insisted during the pretrial hearings that he wanted to go to trial but also demanded the People offer a plea agreement, indicating that he was willing to plead no contest or guilty to some of the charges. While *Smith* held that objections after closing argument were not consistent with *McCoy* error, defendant never made the same postargument complaints as raised in *Smith*, even though he regularly addressed the court when he wanted to complain or object about something. After the verdicts, defendant said he wanted a "mistrial," but he did not claim that defense counsel made concessions in closing argument against his wishes. The court appointed another attorney to determine whether a new trial motion should be filed. At the sentencing hearing, the new attorney advised the court that there was no basis for a new trial motion, and defendant did not interrupt or object to the decision not to file such a motion. As in *Smith*, defendant did not indicate that he disagreed with counsel's strategy prior to closing argument.

Defendant further asserts that his apparent failure to tell defense counsel that he did not want him to concede anything is irrelevant, because there was no evidence that counsel conferred with him prior to closing argument and told him about what defendant was a concession of guilt on four counts. Defendant argues that as in *Farwell*, a silent record is insufficient, and the record must affirmatively show he understood the

35.

constitutional impact of counsel's concession and voluntarily waived his constitutional rights.

One of the duties of an attorney is "to consult with the defendant on important decisions…." (*Strickland v. Washington* (1984) 466 U.S. 668, 688.) As explained in *Cain*, it was "not the trial court's duty to inquire whether the defendant agrees with his counsel's decision to make a concession, at least where … where is no explicit indication the defendant disagrees with his attorney's tactical approach to presenting the defense." (*Cain*, *supra*, 10 Cal.4th at p. 30.) In this case, there is no evidence defense counsel failed in his duties and, in the absence of evidence to the contrary, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 389.)

## II.    The Prior Serious Felony Enhancement

The court found true the allegation that defendant had one prior serious felony enhancement (§ 667, subd. (a)) and imposed a consecutive five-year term.

At the time of the sentencing hearing in this case, the court was statutorily required to impose the section 667, subdivision (a) enhancement and did not have any authority to strike or dismiss it. (§ 667, former subd. (a)(1); § 1385, former subd. (b).)

Effective January 1, 2019, sections 667 and 1385 were amended by Senate Bill No. 1393 (2017–2018 Reg. Sess.; Senate Bill 1393) to remove the prohibitions on striking or dismissing a prior serious felony enhancement. (See Stats. 2018, ch. 1013, §§ 1–2.) The amended statutes apply retroactively to all cases that are not yet final. (*People v. Stamps* (2020) 9 Cal.5th 685, 699; *People v. Garcia* (2018) 28 Cal.App.5th 961, 971–973; *People v. Zamora* (2019) 35 Cal.App.5th 200, 208.)

Defendant contends, and the People concede, that the amendments enacted by Senate Bill 1393 are retroactive and this case should be remanded for the court to decide whether to exercise its discretion to dismiss the prior serious felony enhancement since

the record does not show the court would not have exercised its discretion. We agree that remand is appropriate.

## III. The Prior Prison Term Enhancements

After the jury found defendant guilty of the charged offenses, the court found true the allegations that defendant had six prior prison term enhancements (§ 667.5, subd. (b)). The court imposed five consecutive one-year terms for the enhancements and ordered one enhancement stricken, since it was based on the same underlying conviction as the prior serious felony conviction.

Defendant contends, and the People concede, that the court's true findings to the six prior prison term enhancements and the five consecutive one-year terms that it imposed, must be stricken.

Effective January 1, 2020, Senate Bill No. 136 (2018–2019 Reg. Sess.) amended section 667.5, subdivision (b), to limit prior prison term enhancements to only prior terms that were served for sexually violent offenses as defined by Welfare and Institutions Code section 6600, subdivision (b). (§ 667.5, subd. (b), as amended by Stats. 2019, ch. 590, § 1, eff. Jan. 1, 2020 (Senate Bill 136).) The parties further agree that none of defendant's prior prison terms were served for a sexually violent offense. On remand, the court shall strike its prior true findings and the five years imposed for those enhancements.[12]

---

[12] In defendant's opening brief, he argued the terms imposed for the prior prison term enhancements had to be stricken because defense counsel was prejudicially ineffective. Defendant argued that during the pretrial phase of this case, defense counsel should have filed a petition pursuant to Proposition 47 to reduce the underlying prior felony convictions to misdemeanor offenses, and that would have prevented the court from finding the enhancements true and imposing the terms.

Thereafter, defendant filed a supplemental brief that was based on the enactment of Senate Bill 136, as set forth above, and argued the prior prison term enhancements must be stricken. In raising this argument, defendant acknowledged in his supplemental brief that if the prior prison term enhancements are stricken based on Senate Bill 136, then that would moot the Proposition 47 argument he raised in his opening brief. Given

37.

## IV.    Credits

Defendant contends, and the People concede, that the calculation of defendant's credits must be corrected.  Since the matter is being remanded, the superior court shall address this issue and correct the abstract of judgment accordingly.

## **DISPOSITION**

The matter is remanded for the court to consider whether to exercise its discretion to dismiss the five-year term imposed for the section 667, subdivision (a) prior serious felony enhancement.  On remand, the court shall also strike the true findings and the terms imposed for the section 667.5, subdivision (b) prior prison term enhancements, and recalculate defendant's credits.  The trial court shall prepare and forward to all appropriate parties a certified copy of an amended abstract of judgment.

In all other respects, the judgment is affirmed.


POOCHIGIAN, J.

WE CONCUR:


HILL, P.J.


MEEHAN, J.

---

our conclusion that the prior prison term enhancements must be stricken, we accept defendant's concession and need not reach his Proposition 47 argument.